FILED
2008 JAN 10 PM 2:55
CLERK U.S. DISTRICT COURT CENTRAL DIST. OF CALIF. LOS ANGELES
BY

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

June 2007 Grand Jury

| | |
|---|---|
| UNITED STATES OF AMERICA, Plaintiff, v. ALVARO MURILLO, aka "El Padrino" ("The Godfather"), and ALBERTO DEL REAL-GALLARDO, aka "Panzon" ("Fat Man"), Defendants. | CR No. CR08-00032 <br> I N D I C T M E N T <br> [21 U.S.C. §§ 841(a)(1), 841(b)(1)(A), 841(b)(1)(B), & 846: Conspiracy to Possess With Intent to Distribute and to Distribute Cocaine and Marijuana] |

The Grand Jury charges:

INTRODUCTORY ALLEGATIONS

1. At all times relevant to this Indictment, the Huntington Park Police Department (the "HPPD") was a duly constituted police agency providing law enforcement

//

LWB:lwb

services to the City of Huntington Park, California, and other areas within Los Angeles County.

2.   At all times relevant to this Indictment, the United States Drug Enforcement Administration (the "DEA") was a federal law enforcement agency tasked with enforcing the controlled substance laws and regulations of the United States.  The Los Angeles Field Office of the DEA ("DEA-LA") was the regional office of the DEA responsible for carrying out the DEA's law enforcement mission in Los Angeles, Huntington Park, and other areas within the Central District of California.

3.   At all times relevant to this Indictment, defendant ALVARO MURILLO, also known as ("aka") "El Padrino" ("the Godfather"), was a sworn law enforcement officer employed by the HPPD.  From in or about September 2005 to on or about July 20, 2006, defendant MURILLO also was designated as a Task Force Officer with the DEA to work on three DEA-LA cases.

4.   By virtue of his employment as a law enforcement officer with the HPPD, defendant MURILLO was obligated to comply with the HPPD Law Enforcement Code of Ethics, which, among other things, obligated defendant MURILLO to "recognize the badge of [his] office as a symbol of public faith" and to be "exemplary in obeying the laws of the land and the regulations of [his] department."

5.   Defendant ALBERTO DEL REAL-GALLARDO, aka "Panzon" ("Fat Man"), was enrolled by defendant MURILLO as an HPPD confidential informant in or about October 2000 and thereafter often worked as an informant with defendant MURILLO.  Defendant DEL REAL also worked periodically as a confidential informant for the DEA.

6.   Unindicted coconspirator #1 ("UCC #1"), unindicted coconspirator #2 ("UCC #2"), and unindicted coconspirator #3 ("UCC #3"), aka "the Columbian," (collectively, "the CIs") were confidential informants working for the HPPD, the DEA, or both. Unindicted coconspirator #4 was, for a time, the boyfriend/girlfriend of UCC #2.

7.   These Introductory Allegations are incorporated by reference into Count One of this Indictment.

//
//
//
//

COUNT ONE

[21 U.S.C. §§ 841(a)(1), 841(b)(1)(A), 841(b)(1)(B), & 846]

A. OBJECTS OF THE CONSPIRACY

Beginning on a date unknown to the Grand Jury but at least as early as in or about November 2002 and continuing to in or about September 2006, in Los Angeles County, within the Central District of California, and elsewhere, defendant ALVARO MURILLO ("defendant MURILLO"), aka "El Padrino" ("the Godfather"), and defendant ALBERTO DEL REAL-GALLARDO ("defendant DEL REAL"), aka "Panzon" ("Fat Man"), knowingly and unlawfully conspired, confederated, and agreed with each other and with UCC #1, UCC #2, UCC #3, aka "the Columbian," UCC #4, and others known and unknown to the Grand Jury, to commit the following offenses:

(1) To knowingly and intentionally (a) possess with intent to distribute and (b) distribute five kilograms or more of a mixture or substance containing a detectible amount of cocaine, a schedule II narcotic controlled substance, in violation of Title 21, United States Code, Sections 841(a)(1) and (b)(1)(A); and

(2) To knowingly and intentionally (a) possess with intent to distribute and (b) distribute 100 kilograms or more of a mixture or substance containing a detectible amount of marijuana, a schedule I controlled substance, in violation of Title 21, United States Code, Sections 841(a)(1) and (b)(1)(B).

B. THE MANNER AND MEANS OF THE CONSPIRACY

The objects of the conspiracy were to be accomplished, in substance, in the manner and by the means described below:

1. Defendant MURILLO would, by virtue of his position as a law enforcement officer, sign up individuals – including defendant DEL REAL and UCC #3, aka "the Columbian," – to work as confidential informants with the HPPD or DEA, or begin working with individuals, including UCC #1 and UCC #2, that already had been signed up as confidential informants with the HPPD or DEA.

2. Defendant MURILLO would agree with defendant DEL REAL, the CIs, and UCC #4 to unlawfully steal drugs from drug traffickers. Specifically, defendants MURILLO and DEL REAL would use the CIs and UCC #4 to steal, or "ripoff," controlled substances (including cocaine and marijuana) from drug traffickers; would keep or cause others to keep possession of the controlled substances without lawful authority; and would sell and cause others to sell the controlled substances for the personal gain of defendants MURILLO and DEL REAL and others. Specifically, the conspiracy generally operated as follows:

a. Defendants MURILLO and DEL REAL would instruct the CIs to identify individuals trafficking in illegal drugs, including cocaine and marijuana, and to obtain contact information, usually a name and telephone number, for such drug traffickers.

b. Defendant MURILLO would obtain, either directly or via defendant DEL REAL, the telephone number and other relevant information for a drug trafficker that had been identified by one of the CIs (the "Involved CI").

c. Defendant MURILLO would query law enforcement or public record databases to obtain additional information on the drug trafficker identified by the Involved CI, including whether

the drug trafficker was being investigated by a law enforcement officer or agency.

    d. Defendant MURILLO would contact the Involved CI, or cause defendant DEL REAL to contact the Involved CI, and inform the Involved CI whether the identified drug trafficker was in fact a good candidate for a ripoff.

    e. When a drug trafficker was confirmed as a good ripoff candidate, defendant MURILLO, defendant DEL REAL, or both, would speak with the Involved CI and discuss a general plan by which they would steal the drugs from the drug trafficker.  (When a drug trafficker was not a good ripoff candidate, defendant MURILLO would at times refer the drug trafficker for a legitimate law enforcement investigation.)

    f. Defendant DEL REAL, the Involved CI, or both, would contact the drug trafficker and negotiate the terms of a supposed drug transaction.

    g. After arranging the terms of the drug transaction with the drug trafficker targeted for a ripoff, defendants MURILLO and DEL REAL, often along with the Involved CI, would make further plans for how to carry out the ripoff successfully.

    h. On the day of a planned ripoff, defendant DEL REAL and the Involved CI would meet with the drug trafficker and, by trick, the intervention of defendant MURILLO, or other means, take possession of the drugs and cause the drug trafficker to leave the scene without payment.

    i. Defendant MURILLO, defendant DEL REAL, and/or the Involved CI would discuss arrangements to store and later sell the drugs they had stolen from the drug trafficker they targeted.

j.  After a successful ripoff of drugs from a drug trafficker, defendants MURILLO and DEL REAL would pay the Involved CI for his/her participation in the ripoff, either in cash or by giving the Involved CI a portion of the stolen drugs, and defendants MURILLO and DEL REAL would sell or cause others to sell the drugs they had stolen, keeping the proceeds from the drug sales for their own use.

C.   OVERT ACTS

In furtherance of the conspiracy and to accomplish the objects of the conspiracy, defendant MURILLO, defendant DEL REAL, UCC #1, UCC #2, UCC #3, aka "the Columbian," UCC #4, and others known and unknown to the Grand Jury, committed the following overt acts, among others, in the Central District of California and elsewhere:

November 2002 Cocaine Ripoff

1.   In or about November 2002, defendant MURILLO obtained from UCC #2 the telephone number for "Armando," a cocaine trafficker identified by UCC #2.

2.   In or about November 2002, defendants MURILLO and DEL REAL met with UCC #2 and defendant MURILLO told UCC #2, among other things, that they would work Armando via the "groupo tactica negra" ("black tactic group"), coded language signifying that they would work the drug trafficker for their own benefit rather than as a legitimate law enforcement case.

3.   In or about November 2002, defendant DEL REAL and UCC #2 met Armando and two other men at a market to negotiate the terms of a proposed cocaine transaction.

4. In or about November 2002, just prior to the time for the cocaine transaction, defendant DEL REAL showed UCC #2 the location at which he/she would meet Armando, namely, a Denny's restaurant in Downey, California ("the Denny's"), and the location where defendant DEL REAL instructed UCC #2 to take Armando after making contact with him, namely, an Embassy Suites in Downey, California located across the street from the Denny's ("the Embassy Suites").

5. In or about November 2002, in a telephone conversation, defendant MURILLO told defendant DEL REAL to delay the meeting with Armando because defendant MURILLO was busy and could not be at the location of the meeting during the scheduled time.

6. In or about November 2002, UCC #2 met Armando and two of Armando's men at the Denny's and escorted them to the Embassy Suites.

7. In or about November 2002, defendant MURILLO, defendant DEL REAL, and UCC #2 stole approximately five kilograms of cocaine from Armando.

8. In or about November 2002, shortly after the theft of the cocaine from Armando, defendant DEL REAL called defendant MURILLO and asked defendant MURILLO where they should meet.

9. In or about November 2002, defendant DEL REAL gave UCC #2 a kilogram of the cocaine stolen from Armando to store and told UCC #2 that he (defendant DEL REAL) would pick the kilogram up the next day.

10. In or about November 2002, UCC #2 called defendant MURILLO and told defendant MURILLO to have defendant DEL REAL pick up the kilogram of cocaine he left with UCC #2.

11. In or about November 2002, defendant DEL REAL met with UCC #2 and said that he (defendant DEL REAL) would pay UCC #2 a portion of the proceeds from the sale of a kilogram of cocaine.

12. In or about November 2002, defendant DEL REAL paid UCC #2 approximately $9,000 for UCC #2's participation in the theft of cocaine from Armando.

February 2003 Marijuana Ripoff

13. In or about February 2003, defendant MURILLO obtained from UCC #2 contact information for a woman named "Sylvia" and her husband, marijuana traffickers that UCC #2 had identified.

14. In or about February 2003, defendant MURILLO told UCC #2 that Sylvia qualified for the "tactica negra" ("black tactic"), coded language signifying that they would work Sylvia and her husband for their own benefit rather than as a legitimate law enforcement case.

15. In or about February 2003, defendant MURILLO instructed UCC #2 to introduce defendant DEL REAL to Sylvia as a prospective buyer for marijuana.

16. In or about February 2003, defendant DEL REAL and UCC #2 met with Sylvia and Sylvia's husband and defendant DEL REAL negotiated the terms of a proposed transaction for approximately 250 pounds of marijuana.

17. In or about February 2003, defendant DEL REAL met with UCC #2 and UCC #4 and showed them a briefcase containing fake stacks of $100 bills (stacks of cut paper with $100 bills on each end) that defendant DEL REAL proposed to use in the theft of marijuana from Sylvia and her husband.

18. In or about February 2003, defendant MURILLO, defendant DEL REAL, UCC #2, and UCC #4 stole approximately 250 pounds of marijuana from Sylvia and her husband.

19. In or about February 2003, in a telephone conversation, defendant MURILLO told UCC #2 that they would store the marijuana stolen from Sylvia and her husband at UCC #2's residence; UCC #2 rejected the idea and proposed that they store the marijuana at the residence of UCC #2's daughter.

20. In or about February 2003, defendant DEL REAL and UCC #2 stored the marijuana stolen from Sylvia and her husband at the residence of UCC #2's daughter.

21. In or about February 2003, in a telephone conversation, defendant MURILLO directed UCC #2 to provide defendant MURILLO with the address and telephone number for the residence of UCC #2's daughter and told UCC #2 that they would need to pay UCC #2's daughter for agreeing to store the marijuana.

22. In or about February 2003, defendant DEL REAL removed a portion of the marijuana stored at UCC #2's daughter's house and provided the marijuana to UCC #4 for UCC #4's participation in the ripoff of Sylvia and her husband.

23. In or about February 2003, defendant DEL REAL removed the remainder of the marijuana that had been stored at UCC #2's daughter's house and told UCC #2 that he (defendant DEL REAL) would sell the marijuana and give UCC #2 a portion of the profit from the sale.

24. In or about February 2003, defendant DEL REAL paid UCC #2 approximately $8,000 for UCC #2's participation in the ripoff of Sylvia and her husband.

August 2003 Marijuana Ripoff

25. In or about late July or early August 2003, defendant MURILLO obtained a telephone number for "Johnny," a marijuana trafficker identified by UCC #1.

26. On or about August 6, 2003, defendant MURILLO ran the telephone number for Johnny provided by UCC #1 through a database accessible only to law enforcement personnel that reveals whether the queried subject is under investigation by any other law enforcement personnel or agency.

27. In or about August 2003, defendant DEL REAL negotiated the terms of a proposed transaction for approximately 250 pounds of marijuana with Johnny.

28. In or about August 2003, after having told UCC #1 of plans to ripoff Johnny, defendant DEL REAL told UCC #1 in a telephone conversation to meet defendant DEL REAL in the area near the Embassy Suites.

29. In or about August 2003, during a meeting in the area near the Embassy Suites, defendant DEL REAL instructed UCC #1 on the role UCC #1 would play during the ripoff of Johnny.

30. In or about August 2003, defendant DEL REAL and UCC #1 stole approximately 250 pounds of marijuana from Johnny.

31. In or about August 2003, immediately following the theft of marijuana from Johnny, defendant MURILLO and defendant DEL REAL met inside defendant MURILLO's vehicle parked in the parking lot of a Home Depot.

32. In or about August 2003, defendant DEL REAL told UCC #1 that he (defendant DEL REAL) had called Johnny in defendant MURILLO's vehicle and had pretended to have been arrested (i.e.,

with defendant MURILLO's police scanner on in the background) so that UCC #1 would not have to worry about retribution from Johnny.

33. In or about August 2003, defendant DEL REAL and UCC #1 loaded the marijuana stolen from Johnny into defendant DEL REAL's vehicle.

34. In or about August 2003, defendant DEL REAL gave UCC #1 approximately 20 pounds of marijuana for UCC #1's participation in the ripoff of Johnny.

35. In or about August 2003, after being told by UCC #1 that associates of Johnny had accused UCC #1 of participating in the ripoff of marijuana, defendant MURILLO told UCC #1 to stand his/her ground and deny he/she was involved in the theft of marijuana.

Early 2004 Marijuana Ripoff

36. In or about early 2004, defendant MURILLO obtained from UCC #2 the telephone number for a marijuana trafficker identified by UCC #2 and UCC #4 ("Dealer #1").

37. In or about early 2004, defendant MURILLO told UCC #2 that they should involve UCC #3, aka "the Columbian," in the ripoff of Dealer #1 because they could not reach defendant DEL REAL.

38. In or about early 2004, defendant MURILLO told UCC #2 that he (defendant MURILLO) had checked the telephone number for Dealer #1 provided by UCC #2 and that everything was fine.

39. In or about early 2004, UCC #3 negotiated the terms of a proposed marijuana transaction with Dealer #1, including agreeing that the transaction would take place at a car

dealership.

40. In or about early 2004, just prior to the time of the proposed transaction with Dealer #1, defendant MURILLO met with UCC #3, UCC #2, and UCC #4 at a shopping center to discuss details of the plan to ripoff Dealer #1.

41. In or about early 2004, defendant MURILLO, UCC #2, UCC #3, and UCC #4 stole approximately 160 pounds of marijuana from Dealer #1.

42. In or about early 2004, shortly after the theft of marijuana from Dealer #1, defendant MURILLO met with UCC #2, UCC #3, and UCC #4 in the parking lot of a shopping center and discussed arrangements to store the marijuana stolen from Dealer #1 with UCC #4.

43. In or about early 2004, in a telephone conversation, UCC #3 told UCC #2 that UCC #4 needed to bring to UCC #3 the marijuana they had stolen from Dealer #1.

44. In or about early 2004, in a telephone conversation, UCC #2 told defendant MURILLO that UCC #4 was on the way to deliver the marijuana and defendant MURILLO told UCC #2 that he (defendant MURILLO) was then waiting with UCC #3.

45. In or about early 2004, defendant MURILLO loaned UCC #2 and UCC #4 approximately $3,500 each after UCC #2 and UCC #4 complained to defendant MURILLO that it was taking too long for them to be paid for their participation in the theft of marijuana from Dealer #1.

46. In our about early 2004, defendant MURILLO and UCC #3 met with UCC #2 and UCC #4 near the HPPD; UCC #3 claimed that he/she could not pay UCC #2 and UCC #4 any additional money from the sale of the marijuana stolen from Dealer #1 because the person responsible for transporting the money had been arrested by the police.

April 2004 Marijuana Ripoff

47. In or about April 2004, defendant DEL REAL and UCC #1 spoke by telephone with "David," a marijuana trafficker identified by UCC #1, and defendant DEL REAL began negotiations with David for a proposed marijuana transaction.

48. In or about April 2004, defendant DEL REAL obtained David's telephone number from UCC #1 to provide to defendant MURILLO to check.

49. On or about April 9, 2004, defendant MURILLO ran the telephone number for David through a database accessible only to law enforcement personnel that reveals whether the queried subject is under investigation by any other law enforcement personnel or agency.

50. In or about April 2004, in a telephone conversation, defendant DEL REAL told UCC #1 that they would steal the marijuana that David was willing to sell.

51. In or about April 2004, in a telephone conversation, defendant MURILLO told UCC #1 not to worry about the plan to ripoff David and that they would conduct the ripoff at the same location as the prior marijuana theft from Johnny.

52. In or about April 2004, on the day of the proposed drug transaction with David, defendants MURILLO and DEL REAL met with

UCC #1 in a parking lot behind the Embassy Suites and defendant DEL REAL showed UCC #1 fake stacks of $100 bills that defendant DEL REAL planned to use in the theft of drugs from David.

53. In or about April 2004, defendant MURILLO, defendant DEL REAL, and UCC #1 stole approximately 90 pounds of marijuana from David and one of his associates.

54. In or about April 2004, shortly after the theft of marijuana from David, defendant DEL REAL transported the stolen marijuana to UCC #1's house, let UCC #1 keep approximately 50 pounds of the marijuana as payment for UCC #1's participation in the theft, and took the remainder of the stolen marijuana with him.

<u>May through September 2006 Attempted Cocaine Ripoff</u>

55. On or about May 21, 2006, in a telephone conversation, defendant MURILLO asked UCC #2 (who by that time was cooperating with the government) if a cocaine trafficker UCC #2 had identified was a candidate for "groupo tactica negra" (black tactic group), coded language signifying that they could work the cocaine trafficker for their own benefit rather than as a legitimate law enforcement case.

56. On or about June 6, 2006, in a telephone conversation, defendant MURILLO made arrangements to meet with defendant DEL REAL and UCC #2 to discuss the cocaine trafficking target UCC #2 had identified.

57. On or about June 6, 2006, defendants MURILLO and DEL REAL met with UCC #2 and discussed plans to ripoff the cocaine trafficking target UCC #2 had identified – who, unbeknownst to defendants MURILLO and DEL REAL, was actually an undercover DEA

agent using the name "Don Alex."

58. On or about July 13, 2006, in a telephone conversation using coded language, defendant MURILLO directed UCC #2 to give the telephone number for "Don Alex" to defendant DEL REAL, who would then pass along the number to defendant MURILLO.

59. On or about July 22, 2006, UCC #2 called defendant DEL REAL and left a voicemail message with the telephone number for "Don Alex."

60. On or about July 28, 2006, defendant MURILLO met with UCC #2 and obtained the telephone number for "Don Alex" from UCC #2 and told UCC #2 that he (defendant MURILLO) would have someone else run the number.

61. On or about August 11, 2006, defendant MURILLO gave UCC #2 a $500 cash "advance" that UCC #2 had requested to purchase "Don Alex" a bottle of expensive cognac and thereby make "Don Alex" more likely to agree to a proposed cocaine transaction in the future.

62. On or about August 16, 2006, in a telephone conversation, defendant MURILLO told UCC #2 that he (defendant MURILLO) would have defendant DEL REAL contact UCC #2 so they could talk about the proposed ripoff of "Don Alex."

63. On or about August 16, 2006, in a telephone conversation using coded language, defendant DEL REAL and UCC #2 discussed how many kilograms of cocaine "Don Alex" could provide and whether UCC #2 wanted to carry out the ripoff of "Don Alex."

64. On or about August 21, 2006, defendant MURILLO and UCC #2 discussed how to sell "them" (the kilograms of cocaine from the anticipated ripoff of "Don Alex").

65. On or about August 23, 2006, defendant MURILLO told UCC #2 to wait and give defendant DEL REAL additional time to contact "Don Alex."

66. On or about August 29, 2006, defendant DEL REAL met with UCC #2, discussed details of the plan to ripoff "Don Alex," and spoke with "Don Alex" by telephone in UCC #2's presence to negotiate, using coded language, the terms of a proposed transaction for 30 kilograms of cocaine.

67. On or about August 30, 2006, in a telephone conversation involving coded language, defendant MURILLO instructed UCC #2 to call defendant DEL REAL after UCC #2 said that he/she had been to "Don Alex's" warehouse to load the cocaine for the proposed transaction to occur later that day.

68. On or about August 30, 2006, shortly before the time that the planned ripoff of "Don Alex" was to occur, defendants MURILLO and DEL REAL met in a parking lot behind the Embassy Suites.

69. On or about August 30, 2006, in a telephone conversation, defendant DEL REAL instructed UCC #2 to bring "Don Alex" to the Denny's and call defendant DEL REAL once they (UCC #2 and "Don Alex") had arrived – at which time defendant DEL REAL would instruct UCC #2 to bring "Don Alex" to the Embassy Suites.

70. On or about August 30, 2006, in a telephone conversation, defendant DEL REAL gave "Don Alex" directions to the Denny's and, once "Don Alex" was no longer on the line, instructed UCC #2 that when UCC #2 came to the Embassy Suites with "Don Alex," UCC #2 should walk to the back of the Embassy Suites alone to meet with defendant DEL REAL and have "Don Alex"

wait in the hotel lobby.

71. On or about August 30, 2006, defendant MURILLO, in possession of a pair of binoculars, took up a position in the parking lot of a CVS Pharmacy with a view overlooking the Embassy Suites.

72. On or about September 1, 2006, defendant MURILLO told UCC #2 that on August 30, 2006, he (defendant MURILLO) was parked near the Embassy Suites waiting to see what car "Don Alex" and his men arrived in and ready to call defendant DEL REAL and warn him if "Don Alex" insisted on accompanying UCC #2 to the back of the Embassy Suites (where UCC #2 was to meet with defendant DEL REAL).

//

//

//

73. On or about September 1, 2006, defendant MURILLO told UCC #2 that defendant DEL REAL had brought two fake stacks of money to the Embassy Suites "the other day" (August 30, 2006) to use, if necessary, in the planned ripoff of "Don Alex."

A TRUE BILL

/s/

Foreperson

THOMAS P. O'BRIEN
United States Attorney

CHRISTINE C. EWELL
Assistant United States Attorney
Chief, Criminal Division

JOSEPH O. JOHNS
Assistant United States Attorney
Chief, Public Integrity & Environmental Crimes Section

DOROTHY C. KIM
Assistant United States Attorney
Deputy Chief, Public Integrity & Environmental Crimes Section

LAMAR W. BAKER
Assistant United States Attorney
Public Integrity & Environmental Crimes Section